Mr. Chief Justice Shahkey
delivered the opinion of the court.
The plaintiffs in error had recovered a judgment against the Mississippi Railroad Company, for $7832, a®d, failing to realize the amount by the process of execution, they resorted to the statutory remedy of garnishee process against the debtors of the bank. The9affidavit required by the statute was filed, and at the same time it was suggested, in writing, that Elliott and sundry other persons, were indebted to the bank. The garnishee process issued, and Elliott alone answered, in substance as follows, to wit: That the Mississippi Railroad Company was a bank incorporated by the legislature; that he was one of the subscribers for the capital stock, and on his subscription was indebted to the bank in the sum of $1160, which amount he was entitled to pay, as he was advised, in the notes or issues of the bank, and accordingly filed with his answer notes to the amount of his indebtedness.
To this answer the plaintiffs excepted, and insisted that Elliott was not entitled to pay his debt in the issues of the bank,- and therefore prayed judgment against him; but the court gave judgment for Elliott, and this is now assigned as error.
The answer and the exception to it, seem to narrow the *443 ground of controversy down to a single point, to wit: had Elliott a right to pay the bank a balance due for stock in the notes of the bank 1 This, as we conceive, depends upon the character of the indebtedness; or, in other words, it depends on the character of‘the fund, of which that debt constituted a part. In connection with this inquiry, the several laws under which this privilege is claimed, are deserving of seme notice. The first act is that'of 1840, which declares “ that all banks in this state, shall, at all times, receive their respective notes at par, in the liquidation of their bills receivable, and other claims due them.7’ Acts of 1840, 21.* The next is that of 1842, the second section of which declares “that in all proceedings against those who may be debtors to banks in this state, by garnishment, the final judgment shall 'be only given against them, to be discharged in the issues of the bankand the third section provides “ that any person who may be summoned as garnishee of any bank in this state, may, either before or after judgment, tender, in payment and satisfaction of such demand or judgment, the amount thereof in the issues of the bank.” Acts of .1842, 140. The object of these laws, taken together, is plain enough. . As the banks had put large quantities of notes in circulation, which' had become depreciated, it was but justice to require that these notes should be taken in as they had been put out, at par, instead of allowing the banks to exact gold'and silver. Under, the practical operation of the first act it was doubtless thought that it was not calculated to-meet all contingencies. The creditors of the banks had a remedy against bank debtors by garnishment, which operated to transfer the debt from the bank to its creditor; and as it was. then not a debt payable to the bank, it-was supposed to be like all other debts, payable in gold and silver. Hence, with the-laudable design of placing bank debtors, who might be garnisheed, on as good a footing as others, the second section of the act of 1842 was introduced. And as the banks might also garnishee the debtors of their debtors, and thus obtain a transfer of the indebtedness, the third section places such debtors in a like condition with those who were indebted to the banks by *444 direct contract. ' One of the great objects of these acts, was to compel the banks to redeem their circulation under all circumstances. The answer of the defendant was based upon the provision in the act of 1S40, and is sustained, as it is said, by the second section of the act of 1842. An argument has been addressed to us on the constitutionality of this section, if it is to be understood as conferring the right claimed. On its constitutionality in its general application to bank debtors, we do not conceive that we are called on to pass. It will be sufficient for our present purpose if we succeed in showing that it cannot be available to those who may be indebted for a part of the capital stock.
This company was chartered in the year 1836, for the purpose of constructing a railroad. It had not, originally, the privilege of banking, but derived such power from a supple-mentál act, passed on the 12th of May, 1837. The provisions of the original charter are therefore of little, consequence in this controversy, as we are now considering it as a bank. The ninth section of the supplemental act provided that books should be opened at different places for the subscription of certain definite amounts of bank stock, in .addition to which,-all the stock that had been “ subscribed, taken, and paid for under the original charter, was converted into bank stock. The subscribers under the bank charter, were required to pay at the time of subscribing, twenty dollars on each share taken, in specie, or in the notes of specie-paying banks.” The charter is silent as to how or when the balance shall be paid, but as the first section conferred all the usual rights, powers, and privileges of banking, which were exercised by other banks in the state, it may be assumed that the balance of the stock was to be paid at such times as the directors might see proper to call it in, which is thp usual regulation, as regards other' banks. The stock in other banks, too, is required to be paid in specie, a regulation which would apply to this bank, by the general provision conferring on it like privileges with other banks in the state, even if the charter had been entirely silent as to the mode of payment. But by requiring that the first instalment should *445 be paid in specie, it necessarily followed that all other instal-ments should be paid in the same way, in the absence of a special provision directing otherwise. Indeed, the payment of the capital stock in specie, is an essential requisite to the existence of a bank. This capital stock constitutes the basis of the circulation, and accordingly we find, by the fifth section, that the bank was restricted in its issues to twice the amount of capital stock actually paid in. We regard it, then, as an indisputable position, resulting both from the general and special provisions in the charter, that subscribers were bound to pay for their stock in specie, or that which was immediately convertible. To what purpose and destiny is the capital stock appropriated, when it is so paid in? By the charter the legislature authorized the bank to issue notes for general circulation. The grant of such a power would have been an imposition on the public, and beyond the scope of legitimate legislative authority, but for the precaution observed in making a suitable provision that a fund should be deposited and set apart for the payment of these notes. Whilst the legislature conferred this privilege on the bank as a source of profit, justice required that the public should have some assurance that the notes were issued on a solid foundation — on an actual capital in deposit, or provided for their redemption. That assurance is given by requiring that the capital stock shall be paid in specie. It is generally true that directors are allowed to call in the capital stock by instalments, to suit the exigencies of the bank, which is an authority given on the presumption that it will be exercised with due fidelity. It is also true that banks are usually permitted to issue notes to an amount exceeding the amount of capital stock. This is supposed to be justified by the laws which regulate a circulating medium, which are thought to justify a presumption that a.sufficient amount will always be employed in the trade of the country to enable the bank to meet the actual calls upon it, and that the whole circulation will be ultimately redeemed by the profits. The public, then, are supposed to have ample indemnity; but to charter a bank, and authorize it to issue notes, without an actual capital, would *446 be the worst form of legal fiction. The object, then, in requiring that a money fund should be provided, is apparent, and it fixes beyond controversy the character of that fund. Being provided and set apart by law for the payment of the notes, the moment the notes are put in circulation, it becomes a trust fund for the benefit of the note-holders. The notes circulate on the faith of that pledge, and on that alone. It was said by Chief Justice Parker, in the case of Spear v. Grant, 16 Mass. R. 9, that, by force of the act of incorporation, the stock was a pledged fund for the payment of all the debts of the institution. And he added, that if any of it should be withdrawn before the debts were paid, there would seem to arise an equitable obligation on the part of the stockholders, to account for so much as they originally consented to subscribe. In the case of Wood v. Dummer, 3 Mason’s R. 308, a bill was filed on the chancery side of the circuit court for the district of Maine, by a creditor, or note-holder, after the dissolution of the corporation, against a stockholder who had withdrawn a portion of his capital stock, on a distribution made by the directors. The language of Judge Story, in deciding the case, is so forcible and appropriate as to justify a quotation at some length.' “ It appears to me,” said the great jurist, “very clear, upon general principles, as well as the legislative intention, that the capital stock of banks is to be deemed a pledge or trust fund for the payment of the debts contracted by the bank. The public, as well as the legislature, have always supposed 'this to be a fund appropriated for such purpose. The individual stockholders are not liable for the debts of the bank in their private capacities. The charter relieves them from personal responsibility, and substitutes the capital stock in its stead. Credit is universally given to this fund by the public, as the only means of payment. During the existence of the corporation, it is the sole property of the corporation, and can be applied only according to its charter, that is, as a fund for the payment of its debts, upon the security of which it maydiscount and circulate notes. Why, otherwise, is any capital stock required by our charters'? If the stock may, the next day after it is paid in, be withdrawn by the *447 stockholders, without payment of the debts of the corporation, why is the amount so studiously provided for? and its payment by the stockholders so diligently required ? To me this point appears so plain upon principles of law, as well as common sense, that I cannot be brought into any doubt that the charter of our banks make the capital stock a trust fund for the payment of all the debts of the corporation. The bill-holders and other creditors have the first claims upon it; and the stockholders have no rights until all the other creditors are satisfied. They have the full benefit of all the profits made by the establishment, and cannot take any portion of the fund, until all .the other claims on it are extinguished. Their rights are not to the capital stock, but to the residuum, after all demands are paid. On a disposition of the corporation, the bill-holders and the stockholders have each equitable claims; but those of the bill-holders possess, as I conceive, a prior exclusive equity.” On the ground of this pledge, this beneficial interest vesting in the note-holder, he decreed that the holder of that fund, although distributed to him on a dissolution of the corporation, should pay to the creditor in proportion to the amount he had withdrawn. The same doctrine was announced by Chancellor Buckner in Robins v. Embry, 1 S. & M. Chan. R. 207, and in Wright v. Petrie, Ibid. 282. These cases decide that the directors are the trustees for creditors and stockholders, and cannot divert the trust fund from the purposes of its destination ; and also that the equities of creditors will attach to the assets of the bank, even in the hands of an assignee. The condition of a stockholder who has not paid the whole amount subscribed by him to the capital stock, is not materially different from the condition of one who has withdrawn a part after páyrnent. Iii-éither case it is the holding of a pledged fund, and the liability is the same. 'By subscribing the engagement to pay became complete. It was an engagement to appropriate under the charter, a certain amount to a certain specific use, and the appropriation is to be considered as made. The charter attached the pledge to that amount in the hands of the subscriber. If, then, the capital stock be a trust fund, sacredly *448 devoted, by the charter to a particular purpose, on the faith of which the notes put in circulation have been received, and by virtue of such reception a beneficial interest has been acquired by each note-holder, can that fund be withdrawn from the purposes of its destination 1 Or can a worthless substitute be created, or can it be converted into a mere fiction, by legislative act, or otherwise 1 Surely not. The note-holders credited that fund alone. The contract entitles them to nothing else. By receiving the notes they became parties in interest to the trust. They are the beneficiaries, the directors are but trustees, and their'interest cannot be defeated, save by the inadequacy of the fund, or by its mismanagement, which are risks they must encounter. There is no difference between a trust created by law, and one created by contract. It is quite as competent to take from the cestui que trust every form of remedy, as it is to deprive him of the fund on which the remedy is to operate. If the legislature, after having provided and pledged this fund, and rights have been acquired to it, can authorize it to be paid in depreciated paper, its total withdrawal, or any other disposition of it, can also be authorized. On this principle a bank may be chartered at one session, and at the next session, after its notes have been put in circulation, and received on the faith of the charter, authority may be given to pay for the stock in a thing different from that originally provided, or indeed such payments may be dispensed with entirely, which would be virtually the .case if authority be given to pay for the stock in the notes of the bank. This bank was chartered in 1837, and probably went immediately into operation. .The plaintiff commenced this proceeding on the 3d of September, 1841, on a judgment which had been rendered before that timjnof course, and on the day following the garnishment was mm upon the defendant in error. If these laws, then, authorize the payment of the notes of the bank for debts due for stock, they of course destroy the interest of the plaintiffs which was previously acquired.
Perhaps it would be sufficient to rest this case on legislative intention alone, though it would seem to require a disregard of *449 the langijjrge used to enable us to do so. The act of 1840, declares th^tt the banks shall at all times receive their own notes “at par, in the liquidation of their bills receivable, and other claims due them.” It does not appear whether Elliott’s indebtedness was evidenced by a note or not, though it certainly was a “ claim.” The objects of the laws must have been twofold ; first, to compel the banks to withdraw the notes they had put in circulation; and, secondly, to enable those who had borrowed the notes of the bank to pay back in what they had received. But in the accomplishment of these objects, it is not to be supposed that the legislature intended to prejudice the rights of those who had received the notes in the course of their circulation, by depreciating their value. No plan could be well devised which would more certainly depreciate bank notes, than to destroy the capital of the bank. And what, is also singular, the act of 1840, which required them to take their own notes in payment, is but a supplement to an act passed the day before, entitled “an act requiring the several banks in this state to pay specie.” It is strange that an act with such a title should withhold from them the means of doing that which it required them to do. If the stockholders were exonerated from paying specie, how was the bank to comply with the requisitions of the act ? A supplement is generally designed to aid an original act, and not to defeat it. It is evident that the legislative mind rested mainly on the notes and bills due the banks for discounts. The comprehensive words “ and other claims,” were doubtless inserted to cover any possible omission with regard to the main subject, without any exact admeasurement of their extent. But even if this view should be correct, still, according to the first position, Elliott is not entitled to pay the balance due for stock, in the notes of the bank.
We forbear any remarks as to the appropriateness of the remedy pursued- It has not been questioned by the answer, nor in the court below, even if it be questionable. Nor are we called on to protect the rights of other parties. The trust fund may be ample for the indemnity of all creditors, for anything *450 • that appears in this record. Elliott, by being a note-holder, is also a creditor, but he is not in a situation to assert his claim, to the prejudice of the plaintiffs. He does not state in his answer that he held these notes when he was garnisheed, and as the claim was then transferred by law, no offset subsequently acquired, could avail him. He has put himself exclusively on his right to pay the plaintiffs in the notes of the bank. The plaintiffs, besides having a general right in all the trust fund, have located it by the garnishment on so much as may be found in the defendant’s hands. The defendant, at the time of the garnishment, had no claim to interpose against the plaintiff’s right. If he has subsequently acquired any, he stands only in the condition of other general creditors. At least, he has urged no special circumstances to entitle him to withhold the amount in his hands.
The judgment must therefore be reversed, and judgment entered on the answer for the plaintiffs.